# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1558

_____

United States of America,      *
                            *

       Plaintiff - Appellee,     *
                            *    Appeal from the United States

      v.                        *    District Court for the
                            *    District of Minnesota.

Clayton Anthony Davis,     *
                            *

       Defendant - Appellant.    *

_____

Submitted: October 18, 1999

Filed: February 7, 2000

_____

Before WOLLMAN, Chief Judge, LAY and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

After the District Court[1] denied his motion to suppress, Clayton Anthony Davis pleaded guilty to a charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The firearm was uncovered by a protective frisk of Davis that occurred during a consensual stop of Davis and his uncle, Quinton Blount. Davis

_____

[1]The HONORABLE MICHAEL J. DAVIS, United States District Judge for the District of Minnesota, who adopted the Report and Recommendation of United States Magistrate Judge RAYMOND L. ERICKSON.

appeals, arguing that the frisk violated his Fourth Amendment rights.  Concluding that the investigating officer acted reasonably under the circumstances, we affirm.

On the afternoon of February 10, 1998, Minneapolis police officer Giovanni Veliz observed Blount and Davis attempting to enter an apartment complex at 1826 Chicago Avenue through its secured back door.   Sergeant Veliz had been patrolling the complex twice a day since September 1997, at the request of its owner/landlord, because of repeated drug dealing and other criminal activity.  During those patrols, Sergeant Veliz had made several narcotics and one weapons arrest.  He had come to know most of the apartment residents by sight and also knew that the back door was sometimes propped open to defeat the building's security system.  So, when Veliz saw two strangers attempting to enter through the back door, his suspicions were aroused.

Blount and Davis spotted Sergeant Veliz's squad car and walked to the front of the building.  Sergeant Veliz drove around to the front, exited the squad car and approached the two men, and asked if he could talk to them.  They agreed, and Blount handed Veliz a driver's license.  Veliz immediately pat-searched Blount for weapons. While pat-searching Blount, Veliz observed Davis nervously move behind Veliz, adjust his jacket, and place his hand in a jacket pocket.  Veliz then pat-searched Davis.  When he felt a hard metal object in the jacket pocket, Veliz ordered Davis and Blount to the ground and called for back-up.  A search of Davis then uncovered the handgun that is the basis for the conviction and twenty-four-month prison sentence he now appeals.

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court first considered the constitutional limitations on the power of police officers to "stop and frisk" suspicious persons.  The Court concluded that a protective frisk or pat-down search, however brief, is both a search and a seizure for Fourth Amendment purposes.  392 U.S. at 19. But the Court held that a protective search for weapons is constitutional, even in the absence of traditional Fourth Amendment probable cause, "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his

experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." Id. at 30. The critical inquiry is whether the officer had "reasonable suspicion." We review this ultimate issue *de novo*, but we review the district court's findings of historical fact for clear error, giving "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996).

On appeal, Davis concedes that his initial exchange with Sergeant Veliz was the sort of concensual encounter that does not trigger Fourth Amendment scrutiny.[2] However, Davis argues that the consensual encounter was transformed into an investigative stop when Veliz pat-searched Blount; that this seizure violated the Fourth Amendment because Veliz lacked reasonable suspicion that Blount and Davis were engaged in criminal activity at the moment Veliz commenced the investigative stop; that Davis's conduct after the stop commenced cannot supply the reasonable suspicion needed to justify an investigative stop; and that the subsequent pat-down search of Davis was therefore an illegal fruit of the unconstitutional Terry stop. In denying Davis's motion to suppress, the district court relied heavily on his furtive actions while Veliz was pat-searching Blount. Thus, a critical element in Davis's theory is the assertion that these actions are irrelevant to our Fourth Amendment inquiry. For the following reasons, we reject that assertion.

Although we agree with Davis that conduct after an investigative stop begins cannot supply the reasonable suspicion needed to justify the stop, see, e.g., United

---

[2]"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Florida v. Bostick, 501 U.S. 429, 434 (1991) (quotation omitted); see generally United States v. McKines, 933 F.2d 1412, 1415-19 (8th Cir.) (en banc), cert. denied, 502 U.S. 985 (1991).

States v. White, 890 F.2d 1413, 1417 n.4 (8th Cir. 1989), cert. denied 498 U.S. 825 (1990), we cannot agree that the pat-down search of Blount was an investigative stop. Terry leaves no doubt that a pat-down search is a seizure.[3]  But it need not follow from the fact that Blount was momentarily seized during the protective frisk that the frisk was also an investigative stop.  The two types of seizures have distinct law enforcement justifications.  During an investigative stop, the officer may briefly detain a person while the officer investigates his reasonable suspicion that criminal activity is afoot. A pat-down search, on the other hand, protects the officer's personal safety while dealing with a person he reasonably believes may be armed and presently dangerous. To be constitutionally reasonable, a protective frisk must also be based upon reasonable suspicion that criminal activity is afoot, and therefore pat-down searches normally occur during investigative stops of persons suspected of criminal activity.  But the two types of seizures are analytically distinct, as is evidenced by the fact that the Supreme Court in Terry upheld the constitutionality of a pat-down search *without considering* whether an investigative stop preceded the protective frisk.  See 392 U.S. at 19 n.16.

The distinction is critical in this case.  If Sergeant Veliz turned the initial consensual encounter into an investigative stop, that would involve a brief but forcible detention in which neither suspect was free to leave.  But Veliz did nothing to change the consensual nature of the encounter except frisk Blount for weapons.  When that momentary seizure ended, Blount remained free to answer Veliz's questions or to leave (assuming the search uncovered no weapons).  And Blount's companion, Davis, was free to break off the consensual encounter and leave *during or after* the protective search of Blount.  Because the consensual nature of Davis's encounter with Veliz did not change, we need not consider whether Veliz had reasonable suspicion to make an investigative stop at the time he frisked Blount.  The only relevant question is whether Veliz reasonably concluded, *after* pat-searching Blount, that officer safety justified a

---

[3]"Officer McFadden 'seized' petitioner and subjected him to a 'search' when he took hold of him and patted down the outer surfaces of his clothing."  392 U.S. at 19.

pat-down search of Davis because "criminal activity may be afoot and [Davis] may be armed and presently dangerous." Terry, 392 U.S. at 30.

Davis's assertion that the suspicion justifying a protective frisk must be present at the outset of an investigative stop also fails to recognize the analytical distinction between investigative stops and protective frisks. The danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced. This irrefutably logical proposition is illustrated by our decision in United States v. Abokhai, 829 F.2d 666 (8th Cir. 1987), cert. denied 485 U.S. 907 (1988), where we upheld a protective frisk conducted some ten minutes after the investigative stop commenced. In Abokhai, the investigating officers decided to put the suspects in the back seat of the patrol car to keep warm while a computer check of their identities was in progress. Though the officers initially had no reason to believe the suspects were dangerous, we upheld the later frisk because putting them in the rear of the patrol car increased the risk to officer safety. 829 F.2d at 670-71. Thus, the Fourth Amendment inquiry as to whether a protective frisk was reasonable must focus on the circumstances confronting the officer when he made the decision to frisk. And while subsequently gathered facts cannot "cure" an otherwise unreasonable Terry stop, an individual's actions during a consensual encounter may both crystallize previously unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety.

Accordingly, the constitutionality of Sergeant Veliz's pat-down search of Davis turns on the totality of the circumstances at the time Davis was searched, not the time when Blount was searched. Viewing the facts from the vantage point of "those versed in the field of law enforcement," United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996) (internal quotation omitted), cert. denied 520 U.S. 1130 (1997), we agree with the district court that Sergeant Veliz reasonably believed that Davis might be armed and presently dangerous and criminal activity might be afoot. Veliz suspected criminal

activity when he observed Davis and Blount trying unsuccessfully to gain access through the back door of a building where repeated drug dealing had occurred. Whether that gave Veliz enough suspicion to conduct an investigative stop became academic when Blount and Davis agreed to answer questions. While conducting the protective frisk of Blount, Veliz observed Davis moving nervously to the officer's rear. We adopt the Magistrate Judge's analysis of why that suspicious conduct justified the pat-down search of Davis:

> The concern of Veliz, for his personal safety, was not premised upon some illogical, unfounded premonition, but upon the appearance of an observer [Davis], to a pat-search of a companion [Blount], moving to the searcher's backside, while adjusting his jacket, and inserting a hand in his jacket pocket. Given the totality of these circumstances, we find the actions of [Davis] sufficiently ominous to reasonably suggest a threat to Veliz's person.

Finally, Davis argues in the alternative that the district court committed clear error in crediting Veliz's testimony as to Davis's actions during the frisk of Blount, because this testimony went beyond Veliz's contemporaneous police reports. However, giving give due weight to the district court's credibility determinations, see United States v. Gleason, 25 F.3d 605, 607 (8th Cir.), cert. denied 513 U.S. 911 (1994), its findings are not clearly erroneous.

The judgment of the District Court is affirmed.

LAY, Circuit Judge, dissenting.

I must respectfully dissent.

There is little doubt that this is an illegal search violating the Fourth Amendment of the Constitution. Consequently, the seizure of the weapon from the defendant should have been suppressed. When considering the totality of the record, it is clear that Officer Veliz's actions in this case rested solely upon a police officer's racial-drug profiling which guided him throughout the circumstances involved. This is made clear in the four-page written report filed by Officer Veliz shortly after the incident took place.[4] Veliz testified that his particularized report stated "I approached <u>the two defendants</u> and asked them if I could talk to them. <u>The defendants agreed. Because I have recovered narcotics and guns in the past, I did a pat search of the defendant's outer garments</u>." Tr. 36-37. (emphasis added). Significantly, the report does not record any suspicious or furtive acts by either Blount or Davis that would support Veliz's decision to frisk either of the two men. Based on Officer Veliz's initial report, there can be little question that the frisk and "search" of both men was conducted solely because of Officer Veliz's appraisal of the racial and narcotic profile of the two men.

Further, it is significant to me that omitted from the majority opinion is any reference to the fact that the government conceded at oral argument on appeal that there was no articulable, reasonable grounds or suspicion for the officer to pat down Blount and that the search of Blount was unconstitutional. I deem such an admission significant. Although the majority opinion chooses to treat the parties separately, it is clear from police reports and the record, that both parties were treated alike by Officer Veliz. Officer Veliz testified, as he also set forth in his report, that the search of both men was performed simply because he had recovered narcotics and guns at that apartment building on prior occasions.

---

[4]Officer Veliz testified at the suppression hearing that he attempted to make the report as detailed and "accurate as possible" because he knew that "people rely upon these reports" and that these reports are necessary to decide whether to charge an individual.

There is perhaps no other area of constitutional law in which there exists more conflicting judicial opinions than in the field of search and seizure. The Supreme Court, in its explication of this often misunderstood doctrine of constitutional law, has attempted to direct lower courts to balance the protection of individual privacy with officer safety, while affording a necessary tool for law enforcement. For appellate courts to effect a fair balance, however, it is imperative that they stay within the boundaries of the factual record and consider the totality of the sequential facts. I respectfully submit this has not been done here.

There is no question Officer Veliz observed two black men, the defendant, Clayton Davis and his uncle, Quinton Blount, coming from the rear of a twenty-six-unit apartment building near downtown Minneapolis one afternoon. The record reflects that Davis and Blount walked to the front door of the building, at which time the officer approached the two men. The officer asked if he could talk to them. As the majority sets forth, the two men consented and, in fact, Blount immediately handed Officer Veliz his driver's license and stated he was visiting his aunt in the apartment building. Without seeking permission from either Blount or Davis, Officer Veliz immediately conducted a pat-down search of both men because, as Officer Veliz testified, he had been involved in a prior narcotic and weapon arrest at that apartment building.

Also omitted from the majority opinion is the factual scenario that Officer Veliz's written report remained intact until shortly before trial when he prepared a one-page supplement to the report. Although the record does not specifically identify the date of the first written supplement, Officer Veliz testified that officers prepare written supplements when called to court to "refresh" their recollection of the events that took place, and to prevent officer embarrassment by defense attorneys. In his first written supplement and in his testimony given at the suppression hearing some four months after the incident, Veliz, for the first time, raises additional facts not included in the first detailed report. He wrote: "When I looked at [Davis] he appeared nervous and put his

hand <u>inside</u> one of his jacket pockets. Because I recovered narcotics and guns in the past and for officer safety, I did a pat search of AP2, Blount." These facts, however, express nothing more than an inchoate suspicion or hunch by Officer Veliz leading to the search of the Davis and his uncle.

Officer Veliz subsequently filed a second supplementary report. Again, it is unclear when this report was written in relation to the writing of the main report. It is reasonable, however, to assume this supplementary report was written near the time of Veliz's testimony at the suppression hearing. This time, Veliz amended his report to indicate that while he was searching Blount, Davis positioned himself behind the officer and "had a hand <u>in his pocket</u>."

Thus, even before the suppression hearing, Veliz had changed his original report on two occasions. He then changed his rendition of the facts for a third time at the suppression hearing. On cross-examination, Officer Veliz testified to the following: "He was – he positioned himself behind me while I was searching Blount. And then when I looked at him that's when he began leaning back and he was moving his jacket." The record before us reveals that none of these details are in the written reports.

There is no question Veliz's vacillating, contradictory reports make his credibility difficult to accept; however, even assuming the final version of his testimony is true, there is no legal basis to accept his explanation as constitutionally sufficient to justify a search. The majority finds from the innocuous facts of Davis putting his hand in his coat pocket, leaning back and moving his jacket, that there is some reasonable objective grounds to believe that the officer had a sufficient basis to conduct a protective search. In my judgment, this is a complete non sequitur. Such testimony in no way supports a reasonable belief that the officer's life was in fact placed in danger.

The majority holding is directly contrary to the United States Supreme Court opinion in Sibron v. New York, 392 U.S. 40, 64 (1968), in which the Court observed: "In the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which [the officer] reasonably inferred that the individual was armed and dangerous." In Sibron, the Supreme Court felt that the defendant's act of putting his hands in his pocket did not give rise to a reasonable fear for the police officer's safety. There is no basis to suggest that Veliz's belief stands on a different footing. Where an officer conducts a protective frisk based only on a hunch or ungrounded suspicion that an individual might be carrying a weapon, such speculative suspicion cannot serve as a constitutionally reasonable ground for a Terry-type frisk. See Terry v. Ohio, 392 U.S. 1, 30 (1968).

Constrained by Officer Veliz's admission that Davis and Blount were doing nothing that aroused his suspicion of criminal activity, the majority asserts that this case falls outside the context of an investigative stop which requires a reasonable articulable suspicion that criminal activity was afoot. In such a consensual encounter, however, the admitted absence of the requisite suspicion of criminal activity is all the more reason to hold that a reasonable person would not possess sufficient objective facts to say that the behavior of Davis or Blount provided reasonable grounds for the officer to believe that his safety was threatened. Id. at 30 (protective frisk reasonable under Fourth Amendment where "officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous") (emphasis added).

It should be kept in mind that this incident took place on February 10, 1998, and although the temperature is not recorded, this court should take judicial notice that it would not be unusual for a person standing outdoors in a Minnesota winter to place his hands in his jacket pockets. Whether Davis had his hands inside the pockets, or

whether he later put them there, this behavior certainly does not, in itself, establish reasonable grounds to believe that the officer's safety was in danger. This is particularly true, as previously stated, because the defendant and his uncle were in fact cooperative and voluntarily discussed this entire matter with the officer without any force or coercion. The fact that one has "moved" his jacket, without more, does not serve as additional reasonable grounds for an officer to believe the defendant was carrying a weapon, see United States v. Davis, 94 F.3d 1465, 1469 (10th Cir. 1996) (no particularized basis for suspecting defendant was armed where defendant had his hands in his coat pockets on a winter night in Oklahoma), nor does the fact that a defendant may have appeared to an officer to be "nervous" provide sufficient constitutional basis to believe a putative defendant may be carrying a gun. See Florida v. Royer, 460 U.S. 491, 506 (1983); United States v. O'Neal, 17 F.3d 239, 241-42 (8th Cir. 1994) ("'becoming nervous when one is confronted by officers of the law is not an uncommon reaction'") (quoting United States v. White, 890 F.2d 1413, 1418 (8th Cir. 1989)).

When one reflects on the entire factual record, it is difficult to say that the ensuing search of Davis should be upheld. I would reverse.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-