# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1367

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the Eastern |
| | * District of Arkansas. |
| Myron Sawyer, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted: September 22, 2009
Filed: December 3, 2009

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

Myron Sawyer appeals the district court's[1] denial of his motions to suppress physical evidence seized from his vehicle and his confession admitting to bank robbery. Additionally, he appeals the district court's conclusion at sentencing that, based on a previous conviction for attempted robbery, he was a career offender under U.S. Sentencing Guidelines (U.S.S.G.) § 4B1.1(b)(B). We affirm.

_____

[1]The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

The following facts, taken verbatim from the district court's September 5, 2008, order denying Sawyer's motions to suppress, are reviewed for clear error. See United States v. Almeida-Perez, 549 F.3d 1162, 1170 (8th Cir. 2008).

On June 22, 2007, shortly after noon, the Bank of Little Rock, located at 5120 Kavanaugh Boulevard, Little Rock, Arkansas, was robbed by a single, armed and masked person. The robbery was recorded by a video camera in its entirety. The robber first demanded that everyone get on the floor as he brandished the handgun and then demanded money. He wore a face mask and green jumpsuit and his voice appeared to be that of a black male. He vaulted on and over the bank counter to access the money. The surveillance video confirmed that he stepped on the counter during the robbery. A later audit determined the loss to be $10,823.00.

A citizen, Mr. Lane Guthrie, was driving east on Kavanaugh Blvd. when he observed a black male sprinting South across Kavanaugh and down an alley in the vicinity of the bank. Mr. Guthrie attempted to follow this person. He then observed a gold Saturn automobile turn westbound on Cantrell Road slightly behind him. Mr. Guthrie had turned right on Cantrell just as the gold Saturn entered heavily traveled Cantrell without slowing down. Mr. Guthrie allowed the gold Saturn, which was swerving, to pass him and observed that it had Arkansas license #668-JHW. Mr. Guthrie observed two black males in the front seat. He followed the vehicle to University Avenue where it turned South. Mr. Guthrie continued to follow the vehicle down University to the Park Plaza area near the intersection of University and West Markham Street. On the way, he observed a third black male sit up in the back seat. Mr. Guthrie then returned to Kavanaugh where he had first observed the suspicious man running across the street. He observed police officers at the bank and provided them with this information.

The masked robber had demanded that the bank tellers put the money in a bag that he brought along. Hidden in the money given to the robber was an electronic tracking device ("ETD") which was activated. Using

GPS technology, the ETD allowed the police to track the movement of the get-away vehicle as it traveled east on Interstate 630, then Southbound on Cedar and finally, westbound on Asher Avenue. This information was broadcast on the police radio.

At approximately 12:05 p.m., Detective Tommy Hudson was filling his patrol car with gas at the corner of Fair Park Blvd. and W. Markham Street near War Memorial Stadium when he heard about the robbery over the radio. He learned that the suspect was a black male in a green jumpsuit. He also learned that the signal from the ETD indicated that the suspect was in a vehicle heading East on I-630 and then South on Cedar Street. Detective Hudson drove South on Cedar to a location near Asher Ave. and Madison St. where he observed a gold Saturn traveling at an unusually high rate of speed across the parking lot of Bennett's Tire Service ("Bennett's"). By this time the area was saturated with marked police vehicles. Detective Hudson was traveling so fast that he passed the gold Saturn before he could stop. He quickly turned his unmarked vehicle around and activated the blue lights.

The gold Saturn exited Bennett's parking lot and quickly parked at an adjacent minimarket. Detective Hudson pulled in behind the Saturn, partially blocking it. Detective Hudson testified that he learned around this time that the robbery suspect was believed to be in a gold Saturn. The male driver, later determined to be the Defendant Myron Sawyer, exited the Saturn and quickly moved away, but was promptly ordered to the ground at gunpoint.

Another officer, Kenny Baer, had arrived by this time in a marked police unit. As he arrived, Officer Kenny Baer found that Detective Hudson was in the process of ordering a suspect to the ground. He pulled his gun and covered while the Defendant was hand-cuffed. The Defendant was then walked to Officer Baer's marked police car to be frisked. As Detective Hudson walked with Defendant past the Saturn, he observed through the open window a gun on the floor of the front seat passenger side. Officer Baer conducted a pat down of the Defendant and then locked him in his unit. Officer Baer noted that the Defendant was secured at 12:28 p.m.

Officer Hudson then returned to the Saturn to secure the gun, later identified as a Ruger 9 mm pistol that was fully loaded with one cartridge in the chamber. In clear view in the back seat Detective Hudson also observed a green jumpsuit and a bag with money falling out of it. Detective Hudson secured the evidence and disabled the tracking device.

Another officer found additional evidence in and around a dumpster located behind Bennett's. The evidence included a Louis Vuitton purse (reported stolen by a bank customer during the robbery), a wig, sunglasses, and a knit ski mask.

Officer Baer was the officer who completed the form necessary to have the gold Saturn towed. The tow vehicle report . . . shows this occurred at 12:35 p.m. Officer Baer then transported the Defendant to the Little Rock downtown detective station.

Officer Jennifer Zarlingo, a crime scene specialist with the Little Rock Police Department, responded to the Bank at around 12:52 p.m. She retrieved the video. She also located and "lifted" a shoe print which was on the counter top. The imprint clearly showed the following identification: "US Polo Assn."

. . .

The Defendant was not questioned at the scene. There is no evidence that he made any statements at the scene. Following his arrest and while sitting in an interrogation room at the police department, the Defendant made a statement confessing to the robbery. Defendant's statement was made at approximately 3:02 p.m. on the same day in which the Bank of Little Rock was robbed. That statement was tape-recorded and a transcript thereof has been made.

Although other evidence relates to the issue, the two prosecution witnesses relied upon principally by the Government were Little Rock Police Officers Bobby Martin and Eric Hinsley. After the Defendant Myron Sawyer was arrested he was taken to a Little Rock Police

-4-

Department detective station where he was placed in an interview room. Officer Bobby Martin testified that he advised the Defendant of his Miranda rights at approximately 1:35 p.m. by reading same to him. The Defendant gave his date of birth, his address and acknowledged that he could read and write. He declined, however, to sign the form waiving his rights and agreeing to answer questions regarding the bank robbery. Officer Bobby Martin testified that the Defendant advised he had "nothing to say." Officer Martin then left the interrogation room and proceeded to investigate another matter.

Detective Eric Hinsley first responded to the bank robbery by going to the bank and interviewing witnesses there. While he was at the bank, learned of the shoe print found on the bank counter which clearly displayed the clear logo "US Polo Assn." When Detective Hinsley arrived back at the police station, he went to the interview room to check on the Defendant's shoes. He asked to see the Defendant's shoes and Defendant obliged. As he examined the Defendant's shoes, Detective Hinsley noted audibly in the Defendant's presence that they "matched" the print taken from the counter of the bank. Detective Hinsley may have also mentioned in the Defendant's presence other evidence known to the police including the car, gun, money, clothes, etc. At this point, the Defendant began asking questions about the case, indicating to Detective Hinsley that he wanted to talk about the case.

Thereupon Detective Hinsley left the interrogation room, obtained a Miranda form, returned and carefully read Defendant his Miranda rights while having the Defendant read same along with him. After the Defendant had been properly mirandized Detective Hinsley took a taped statement from the Defendant. Detective Hinsley did not know that Officer Martin had previously mirandized him at 1:35 p.m. The Defendant spent most of the time between 1:35 p.m. and 3:00 p.m. (the time he was mirandized by Detective Hinsley) alone in the interrogation room. He was not threatened or cajoled by anyone. He was not interrogated or asked to make a statement.

The Defendant chose to testify at the suppression hearing but the Court finds little to credit in his testimony. The Court specifically finds that

the Defendant never asked Officer Martin or Detective Hinsley, or anyone else, to obtain an attorney for him, never requested the opportunity to make a phone call, and never stated that he wanted to talk to his mother. The Defendant's testimony is controverted by his own taped statement, in which he acknowledges that he was properly advised of his rights and was agreeing to provide police with a statement regarding the bank robbery. The evidence establishes that the Defendant voluntarily indicated to Officer Hinsley that he wanted to talk after being made aware of the overwhelming case that the Government had against him. No promises were made to him to elicit his statement, although he surmised that he might benefit if he cooperated.

. . .

The police scrupulously honored Defendant's initial invocation of his right to remain silent. At 1:35 p.m., when the Defendant indicated he did not want to talk, Officer Martin immediately left the room and did not thereafter attempt to question the Defendant. At 3:00 p.m., Defendant himself indicated a desire to talk when he began asking questions of Detective Hinsley. Detective Hinsley advised Defendant of his Miranda rights, which the Defendant agreed to waive immediately prior to making a statement confessing to the bank robbery.

Dist. Ct. Order dated September 5, 2008, pp. 1-7.

Based on these facts, the district court concluded police had a reasonable articulable suspicion to believe Myron Sawyer was involved in the bank robbery and were justified in detaining him briefly. The court further concluded the brief detention led to discovery of the physical evidence in Sawyer's vehicle connecting him to the robbery and gave rise to probable cause for his arrest. Accordingly, it denied his motion to suppress the physical evidence.

The court also denied Sawyer's motion to suppress his confession, concluding police honored his original request to remain silent and only initiated the second interrogation after Sawyer expressed his desire to talk about the robbery.

-6-

After the district court denied Sawyer's motions he entered a conditional plea of guilty to armed bank robbery under 18 U.S.C. § 2113(a) and (d), reserving his right to appeal the denial of his suppression motions.  At sentencing, the district court concluded he was a career offender under § 4B1.1(b)(B) of the Sentencing Guidelines and sentenced him to 210 months imprisonment.

On appeal, Sawyer argues the court erred in concluding police had a reasonable articulable suspicion to detain him.  He further argues had he not been detained in violation of his Fourth Amendment rights, police would never have discovered the items of physical evidence in his vehicle which gave rise to probable cause for his arrest.  Therefore, the court erred in failing to suppress the physical evidence.  He also argues the court erred in concluding police scrupulously honored his request to exercise his right to remain silent by conducting the second interrogation and erred in refusing to suppress his confession.  Finally, Sawyer argues his state conviction for attempted robbery was not a crime of violence and the court erred in concluding he was subject to the career offender provision of the Guidelines.

II

We review the district court's factual determinations for clear error and the denial of a motion to suppress de novo.  United States v. Green, 275 F.3d 694, 698 (8th Cir. 2001).  Sawyer's brief sets forth a somewhat different, more favorable, recitation of the facts, but he does not contend the district court's fact findings are clearly erroneous.  Thus, we accept the district court's factual recitation and only review the court's application of law to those facts.

A

Sawyer first argues the police did not have a reasonable articulable suspicion to detain him and had he not been illegally detained they would not have discovered the physical evidence in his vehicle linking him to the robbery.

It is well-established police may stop and briefly question a person if they have a reasonable, articulable suspicion of criminal activity. See Terry v. Ohio, 392 U.S. 1, 21 (1968). When justifying a particular stop, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. "The Fourth Amendment requires at least a *minimal level of objective justification* for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989) (emphasis supplied)).

Given the facts as found by the district court, Sawyer's claim the police lacked even a minimal, objective justification to stop him is incredible. A witness spotted him sprinting from the area near the bank and then followed his vehicle as it sped away from the area, weaving in and out of traffic. The witness immediately reported this information to police and provided a complete description of the vehicle. The police also had information from the electronic tracking device hidden in the money which indicated the money was in the same area where Sawyer's vehicle was observed and later located. When police located Sawyer's vehicle, it was observed driving at a high rate of speed and as police converged he immediately exited in an apparent attempt to flee. These facts easily satisfy the minimal, objective justification" standard required by Terry. Thus, Sawyer's initial detention, which gave rise to discovery of the physical evidence, did not violate the Fourth Amendment and the court did not err in refusing to suppress the evidence.

Sawyer next argues the district court erred in refusing to suppress his confession because police initiated a second interrogation after he exercised his right to remain silent.

An invocation of the right to remain silent does not mean questioning can never be resumed, see Michigan v. Mosley, 423 U.S. 96, 104-05 (1975), nor does it mean a defendant cannot later waive the right, see North Carolina v. Butler, 441 U.S. 369, 374-75 (1979). However, once a person in custody has invoked his right to remain silent, admissibility of any subsequent statements depends on whether his "'right to cut off questioning' was 'scrupulously honored.'" Mosley, at 423 U.S. at 104 (quoting Miranda v. Arizona, 384 U.S. 436, 474 (1966)). Once the right is invoked, the police must immediately cease questioning, allow a "significant amount of time" to pass before questioning begins again, re-advise the detainee of his Miranda rights, and limit the ensuing interrogation to questions regarding a separate crime not the subject of the first questioning session. United States v. House, 939 F.2d 659, 662 (8th Cir. 1991).

Sawyer concedes police immediately ceased questioning him once he invoked his right to remain silent. He contends, however, police did not allow a significant amount of time to pass before they resumed questioning him, and the ensuing interrogation did not involve a crime separate from the first. Therefore, he contends the district court erred when it refused to suppress his confession.

The district court did not find police simply resumed questioning Sawyer after he invoked his right to remain silent. Rather, the court found a detective, while comparing Sawyer's shoe to a print found at the scene, remarked the two matched, and may also have mentioned other evidence against Sawyer connecting him to the crime. Thereafter, Sawyer initiated a conversation and asked to talk about the robbery. He was then re-advised of his Miranda rights and voluntarily confessed. Given these

uncontested facts, his argument, which is premised on a distortion of the district court's fact findings, falls squarely within this court's decision in United States v. Cody, 114 F.3d 772 (8th Cir. 1997).

In Cody the defendant was arrested but not questioned after she allegedly invoked her right to remain silent. Id. at 775. Approximately three hours after allegedly invoking her right to remain silent, officers confronted her with evidence discovered at the crime scene linking her to the crime. Id. at 775-76. Upon being confronted with this evidence, Cody spontaneously made incriminating statements. Id. at 776. An officer immediately interrupted her confession to re-advise her of her Miranda rights and she confessed. Id. Based on those facts, this court concluded Cody's "right to remain silent . . . was not violated when police later confronted her with additional evidence[,]" (citing Mosley, 423 U.S. at 106) "and her subsequent confession was admissible." Id.

The salient facts in this case and Cody are legally indistinguishable. As in Cody, it was Sawyer who initiated the interrogation which led to his confession after being confronted with evidence linking him to the robbery. Therefore, his right to remain silent was not violated and the district court correctly refused to exclude the confession.

C

Sawyer's final argument is the district court erred by finding his state conviction for attempted robbery was a crime of violence and in applying the career offender provision of § 4B1.1(b)(B) of the Guidelines to calculate his sentencing range.

We review the district court's sentence for an abuse of discretion. Gall v. United States, 522 U.S. – , 128 S. Ct. 586, 597 (2007); United States v. Austad, 519 F.3d 431, 434 (8th Cir. 2008). We first

-10-

ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range.

Gall, 128 S. Ct. at 597. If the sentence is procedurally sound, we review "the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Id. "A sentence within the Guidelines range is accorded a presumption of substantive reasonableness on appeal." United States v. Robinson, 516 F.3d 716, 717 (8th Cir. 2008). Sawyer does not argue his sentence is substantively unreasonable. Rather, he contends the district court committed a significant procedural error by finding his Arkansas conviction for criminal attempt to commit robbery qualified as a crime of violence under § 4B1.2(a)(2) of the Guidelines. We review the district court's application of the Sentencing Guidelines de novo. United States. v. Mashek, 406 F.3d 1012, 1016 (8th Cir. 2005).

Under § 4B1.1 of the Guidelines, persons who are convicted of a crime of violence who have at least two prior felony convictions for either crimes of violence or controlled substance offenses, are to be sentenced as "career offenders." Section § 4B1.2(a)(1) of the Guidelines defines a crime of violence as an offense having "as an element the use, attempted use, or threatened use of physical force against the person of another." Further, under the career offender guideline, if a completed offense is a crime of violence, an attempt to commit the offense is also a crime of violence. See § 4B1.2, cmt. n.1 ("'Crime of violence' . . . include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."). The Arkansas robbery statute provides "a person commits robbery if, with the purpose of committing a felony or misdemeanor theft . . . the person employs or threatens to immediately employ physical force upon another person." Ark. Code Ann. § 5-12-102(a). By definition, robbery in Arkansas qualifies as a crime of violence under

§ 4B1.2(a)(1). An attempt to commit an Arkansas robbery automatically qualifies as a crime of violence under the binding commentary to § 4B1.2. Thus, Sawyer's Arkansas state conviction for attempted robbery qualifies as a crime of violence under § 4B1.1, and the district court did not err when it applied the career offender provision.

Sawyer argues his conviction does not qualify as a crime of violence under the Supreme Court's decision in Begay v. United States, 553 U.S. – , 128 S. Ct. 1581, 1584 (2008). In Begay, the Court considered the "otherwise involves conduct that presents a serious potential risk of physical injury" provision of the violent felony definition in § 924(e)(1). Id. at 1586. The Court held to qualify as a violent felony under the "otherwise" provision, the prior offense had to be "purposeful, violent, and aggressive" and similar to the listed examples of "burglary, arson, extortion, and crimes involving the use of explosives." Id. Here, however, the Arkansas robbery statute states "a person commits robbery if, with the purpose of committing a felony or misdemeanor theft . . . the person employs or threatens to immediately employ physical force upon another person." Ark. Code Ann. § 5-12-102(a). Thus, robbery in Arkansas qualifies as a crime of violence under § 4B1.2(a)(1), and attempted robbery qualifies under application note 1 to § 4B1.2. We need not decide whether attempted robbery qualifies under the "otherwise" provision of § 4B1.2(a)(2). See United States v. Brown, 550 F.3d 724, 728-29 (8th Cir. 2008). Accordingly, we conclude the district court correctly applied the career offender provision of § 4B1.1 in calculating Sawyer's advisory Guidelines sentencing range.

III

The judgment of the district court is affirmed.

_____

-12-