# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2741

_____

United States of America

*Plaintiff - Appellee*

v.

Thomas Reddick

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 25, 2018
Filed: November 30, 2018

_____

Before WOLLMAN, KELLY, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

On April 4, 2017, Thomas Reddick was convicted of two counts of being a felon in possession of a firearm. On July 21, 2017, the district court[1] sentenced Reddick to two concurrent 45-month terms of imprisonment. Reddick now appeals

_____

[1]The Hon. Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

the district court's denial of a pre-trial motion to suppress evidence of a firearm, related to the conviction on the second count of felon in possession of a firearm. Reddick asserts there was no valid basis for Sgt. St. Laurent of the Blytheville Police Department to effectuate an investigatory stop or conduct a pat-down search which led to the discovery of the firearm. We conclude the investigatory stop and eventual frisk were each valid under Terry v. Ohio, 392 U.S. 1 (1968), and affirm.

I.      Background

On January 14, 2014, the police responded to a domestic relations call involving a vehicle near 712 Clearlake in Blytheville, Arkansas. The suspect involved in the incident fled the vehicle on foot. Officer Michael Dannar was left to secure the scene. The incident had caused a crowd of onlookers to gather which complicated Dannar's task. While Dannar was securing the scene and instructing onlookers to stay back, a man later identified as Reddick directly approached Dannar and the car. Dannar told the man to stop, stating, "If you're coming after the car, you're not getting it." Dannar later explained this command by relating past experiences where persons who have no legitimate ownership interest in a vehicle abandoned during a police interaction appear and falsely claim ownership or a right to possess the abandoned vehicle. Reddick responded to Dannar's instructions by gesturing with his arms at Dannar without removing his hands from his large, bulky coat pockets. Reddick did not follow Dannar's instructions to stop approaching the vehicle.

At approximately the same time, Sgt. St. Laurent arrived to aid Dannar at the scene. Dannar told St. Laurent that an unidentified man (Reddick) was trying to walk onto the crime scene. Dannar asked St. Laurent to identify the man. St. Laurent later testified that based on the urgent tenor of Dannar's voice, he understood that he needed to act quickly.

St. Laurent approached Reddick, who was standing slightly outside the crime scene. Reddick continued to have his hands in his coat pockets. St. Laurent asked him what he was doing and why he would not leave. St. Laurent thought Reddick's answers were "evasive." Reddick claimed not to have any identification on him. St. Laurent noticed that Reddick had his hands in his pockets. St. Laurent repeatedly asked Reddick to remove his hands from his pockets. While Reddick would briefly comply and remove his hands, he kept placing them back in his pockets. St. Laurent later testified that, in his experience, those carrying a weapon will frequently touch it as if to reassure themselves that it is still there. St. Laurent explained that Reddick's actions made him concerned that the encounter could "evolve into something more."

St. Laurent announced that he would pat the man down as a safety precaution and asked the man whether he had anything on him that an officer should know about. Reddick hesitated before saying, "No." As Reddick turned around, his coat swung out, leading St. Laurent to believe that something of some substance was in Reddick's coat pocket. St. Laurent conducted the frisk and found a .38 caliber Smith and Wesson revolver. At trial, Dannar admitted that he knew of no relationship between Reddick and the original domestic relations incident.

Reddick unsuccessfully moved the district court to suppress the firearm on the theory that he was searched in violation of the Fourth Amendment. The district court held that the officer conducted a valid Terry stop. Reddick appeals.

II.     Discussion

"We review the denial of a motion to suppress *de novo* but review underlying factual determinations for clear error, giving due weight to the inferences of the district court and law enforcement officials." United States v. Hager, 710 F.3d 830, 835 (8th Cir. 2013) (quoting United States v. Nichols, 574 F.3d 633, 636 (8th Cir.

2009)). "We affirm a denial of a motion to suppress unless the district court's decision 'is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made.'" Id. (quoting United States v. Hastings, 685 F.3d 724, 727 (8th Cir. 2012)).

Reddick challenges both the initial investigatory stop and the subsequent protective frisk. Police officers may constitutionally conduct an investigatory search "if they have a reasonable, articulable suspicion of criminal activity." United States v. Sawyer, 588 F.3d 548, 556 (8th Cir. 2009), *abrogated on other grounds by* United States v. Eason, 829 F.3d 633, 641 (8th Cir. 2016). "When justifying a particular stop, police officers 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Id. (quoting Terry, 391 U.S. at 21).

St. Laurent initiated the investigatory stop at Dannar's request. The circumstances surrounding the stop meet the threshold "minimal level of objective justification." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). The scene was hectic, with a large crowd of onlookers. The officers needed to secure the vehicle while searching for the driver-suspect in the domestic relations incident. Before St. Laurent arrived, Dannar was the only law enforcement officer present. Dannar reported that Reddick repeatedly attempted to access the crime scene. Dannar's experience with individuals attempting to illegally obtain possession of vehicles that have been abandoned in the course of a police investigation made him concerned about Reddick's "direct" approach to the vehicle (in contrast to other onlookers). Reddick failed to follow Dannar's instructions to stop approaching the vehicle and instead gestured with his arms while keeping his hands in his pockets. Each of these factors, when viewed in their combined totality, supported the officers' reasonable suspicion of criminal activity.

-4-

Reddick argues that each of these factors is also consistent with innocent activity, but that alone does not answer whether an officer possesses reasonable suspicion. See, e.g., Sokolow, 490 U.S. at 9-10 (quoting Terry, 391 U.S. at 21) ("*Terry* itself involved a 'series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.'"). Law enforcement officers are entitled to evaluate the totality of the circumstances in deciding whether reasonable suspicion is present, and they may possess reasonable suspicion even when innocent explanations can be put forward for each individual circumstance. Cf. Navarette v. California, 572 U.S. 393, 403 (2014) (quoting United States v. Arvizu, 534 U.S. 266, 277 (2002)) (explaining that "reasonable suspicion need not rule out the possibility of innocent conduct"). Here those circumstances provided reasonable suspicion that Reddick was engaged in criminal activity.

Reddick also contests the legality of St. Laurent's protective frisk. Officers may conduct a protective search under Terry "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person [ ] with whom he is dealing may be armed and presently dangerous." United States v. Dortch, 868 F.3d 674, 678 (8th Cir. 2017) (alteration in original) (quoting United States v. Davis, 202 F.3d 1060, 1061 (8th Cir. 2000)). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." United States v. Oliver, 550 F.3d 734, 738 (8th Cir. 2008) (quoting Terry, 392 U.S. at 27).

St. Laurent articulated specific facts that objectively support the pat-down. The most important fact is Reddick's repeated placement of his hands in his large coat pockets, in disregard of St. Laurent's requests and in a manner that St. Laurent's experience led him to conclude was associated with possession of a weapon. Cf. Davis, 202 F.3d at 1063 (8th Cir. 2000) (noting in the context of a consensual encounter that an individual's actions "may both crystallize previously unconfirmed

-5-

suspicions of criminal activity and give rise to legitimate concerns for officer safety"). St. Laurent also drew the reasonable inference from Dannar's "urgent" tone of voice that Reddick posed a potential risk to the police at the scene. Dannar, not St. Laurent, explained that it was not "unusual" for strangers to attempt to possess vehicles unlawfully in these situations—but that context helps explain Dannar's tone of voice. From Dannar's tone of voice, St. Laurent could draw both the inference that "criminal activity [was] afoot" and that the situation may present some danger. Under these circumstances, in which Reddick repeatedly disregarded officer instructions concerning the location of his hands relative to his coat pockets, we cannot conclude that it was unreasonable for an officer to engage in a brief protective search of those same pockets.

III.    Conclusion

We affirm.

—————————————————————