# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1030

_____

United States of America,      *
     *
       Appellee,      *
     *    Appeal from the United States
     v.      *    District Court for the
     *    District of Nebraska.
Keith B. Stewart,      *
     *
       Appellant.      *

_____

Submitted: November 17, 2010
Filed: February 1, 2011

_____

Before RILEY, Chief Judge, MELLOY and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

After deputies discovered crack cocaine in Keith Stewart's vehicle, a federal grand jury returned an indictment charging him with one count of knowingly and intentionally possessing with intent to distribute fifty grams or more of a mixture or substance containing a detectable amount of cocaine base, a violation of 21 U.S.C. § 841(a)(1), (b)(1).  The district court sustained Stewart's motion to suppress the evidence derived from the deputies' search as violative of the Fourth Amendment to the United States Constitution.  The Government appeals, and we reverse.

## I. BACKGROUND

While on patrol at approximately 3:30 a.m. on March 11, 2009, Deputy Andrew Woodward of the Douglas County Sheriff's Office noticed a red sport utility vehicle ("SUV") parked in a Kwik Shop parking lot. According to Deputy Woodward, the area around the convenience store was "a hot spot for a lot of criminal activity," including robberies, thefts, and disturbances. Due to the late hour and the location, Deputy Woodward considered the SUV's presence to be suspicious; despite the extremely cold temperature, the vehicle was parked in a poorly lit area some distance from the Kwik Shop entrance. Deputy Woodward also testified that although the vehicle pulled up to a gas pump, he did not see anyone exit the vehicle to pump gas. The deputy acknowledged, however, that he left the Kwik Shop area for a brief period of time while the vehicle was parked at the gas pump. Deputy Woodward's suspicion led him to run a computer check on the vehicle's license plates, but the check revealed no adverse information.

After the SUV departed the Kwik Shop, Deputy Woodward lost sight of the vehicle. On the advice of another deputy, Jason Stehlik, Deputy Woodward searched for the SUV in a nearby neighborhood where, according to Deputy Stehlik, suspects had parked their vehicles after previous robberies at the Kwik Shop. Deputy Woodward soon located the SUV parked outside a house with its engine running. He positioned his cruiser behind the vehicle and illuminated his spotlight. He then approached the SUV and made contact with the man—later identified as Stewart—seated in the driver's seat. Deputy Woodward asked Stewart what he was doing in the area, and, according to Deputy Woodward, Stewart responded that he was meeting a female friend to aid her in "sneaking behind her husband's back." Later during the exchange, Stewart referred to his friend's previously described "husband" as her "boyfriend." Deputy Woodward also observed that Stewart was "[v]ery nervous[,] . . . very fidgety, couldn't give . . . straight direct answers," and refused to maintain eye contact during the interchange. Stewart explained his earlier presence

at the Kwik Shop by stating that he had been assisting another friend who was having trouble with her car.

Upon Deputy Woodward's asking him to provide a form of identification, Stewart "reached into the center console, reached into . . . the under part of his jacket, reached underneath the seat, and then did each one of those several more times." As a result, the deputy "became very fearful that [Stewart] possibly had a weapon on him" and began to unholster his service weapon. Stewart eventually located his commercial driver's license in his rear pocket and provided it to Deputy Woodward without incident. Deputy Woodward then returned to his cruiser, contacted Deputy Stehlik to request back-up, and ran a check on the license. The check indicated that Stewart had a prior felony conviction and "some type of drug history and some type of violent behavior," although there were no active warrants for his arrest and no problems with his license.

Deputy Stehlik arrived soon after. The two deputies briefly conferred, during which time Deputy Stehlik observed Stewart, still seated in his vehicle, "motioning towards the center console and then underneath the seat several times." Deputies Woodward and Stehlik then approached the SUV and instructed Stewart to exit the vehicle. Although the video device in Deputy Woodward's cruiser recorded the interaction, neither Deputy Woodward nor Deputy Stehlik activated his microphone. Deputy Woodward patted Stewart down for weapons, opened Stewart's coat, and reached into his pockets. Deputy Woodward later testified that Stewart verbally consented to the search of his pockets, although Stewart denies that he gave consent. In one of Stewart's pockets, Deputy Woodward found an item of drug paraphernalia—a mesh pipe filter. Although the deputies did not intend to arrest Stewart for possessing the filter,[1] Deputy Stehlik escorted Stewart to one of the

---

[1] Under Nebraska law, possession of drug paraphernalia is an infraction, Neb. Rev. Stat. § 28-441, which, except under certain circumstances, is not an arrestable

cruisers to fill out a field interview card while Deputy Woodward entered Stewart's SUV and searched the immediate area around the driver's seat for weapons. Inside the center console, Deputy Woodward located a bag in which he discovered crack cocaine, a scale, and several bundles of currency.

Based on the drugs seized from the vehicle, a federal grand jury returned a one-count indictment charging Stewart with knowingly and intentionally possessing with intent to distribute fifty grams or more of a mixture or substance containing a detectable amount of cocaine base. Stewart entered a plea of not guilty and filed a motion to suppress the crack cocaine, arguing that Deputy Woodward's search of his vehicle violated the Fourth Amendment. A magistrate judge recommended that the motion to suppress be denied, but the district court sustained the motion. *United States v. Stewart*, 675 F. Supp. 2d 973 (D. Neb. 2009). The Government now appeals, arguing that the search of Stewart's vehicle was constitutional as a protective search under *Terry v. Ohio*, 392 U.S. 1 (1968), and *Michigan v. Long*, 463 U.S. 1032 (1983).

## II. DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although the Fourth Amendment prevents police officers from seizing a person without a reasonable suspicion of criminal activity, scrutiny under the amendment is not triggered by a consensual encounter between an officer and a citizen. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A seizure does not occur "simply because a police officer approaches an individual and asks a few questions," *id.*, so long as "a reasonable person would feel free 'to disregard the police and go about his business,'" *id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Even when officers have no basis for suspecting a particular individual, they may

offense, § 29-435.

generally ask the individual questions and request to examine his or her identification. *Id.* at 435. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 434 (quoting *Terry*, 392 U.S. at 19 n.16).

The district court concluded that Deputy Woodward's initial encounter with Stewart was consensual. Stewart does not meaningfully contest this determination on appeal, and, in any event, we agree with the district court's characterization of the initial encounter as consensual. *See United States v. Carpenter*, 462 F.3d 981, 985-86 (8th Cir. 2006). Likewise, we agree with the district court that the deputies' conduct subsequently triggered Fourth Amendment scrutiny when they directed Stewart to exit his SUV and commenced the protective search. *See United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) ("A protective frisk is both a search and a seizure for Fourth Amendment purposes."). The Fourth Amendment inquiry as to whether a protective search was reasonable must focus on the circumstances confronting the officer when he made the decision to search. *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000). In this case, then, we must evaluate the constitutionality of the deputies' conduct as of the moment they began the protective search. *Cf. id.* at 1062 ("[C]onduct after an investigative stop begins cannot supply the reasonable suspicion needed to justify the stop.").

Protective searches of persons and vehicles both fall within the exception to the warrant requirement outlined in *Terry* and in *Long*. In *Terry*, the Supreme Court held that a law enforcement officer may subject a suspect to a protective search for weapons if he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot *and* that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30 (emphasis added); *see also Davis*, 202 F.3d at 1062. The principle announced in *Terry* has been extended to include vehicle searches. *See Long*, 463 U.S. at 1049. Observing that "roadside encounters between police and suspects are especially

hazardous," the Court in *Long* held, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief . . . that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* Additionally, it is settled that once reasonable suspicion is established, a protective search of a vehicle's interior is permissible regardless of whether the occupants have been removed from the vehicle. *See id.* at 1052 ("[I]f the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside."); *see also United States v. Goodwin-Bey*, 584 F.3d 1117, 1120 (8th Cir. 2009) ("In reexamining the search incident to arrest exception to the warrant requirement, *Gant* left [the holding in *Long*] untouched." (citing *Arizona v. Gant*, 556 U.S. ---, 129 S. Ct. 1710, 1721 (2009))).

In considering the reasonableness of an officer's suspicion, "we must determine whether the facts *collectively* provide a basis for reasonable suspicion, rather than determine whether each fact separately establishes such a basis." *United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002). To be reasonable, suspicion must be based on "specific and articulable facts" that are "taken together with rational inferences from those facts"—that is, something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 21, 29; *see also Long*, 463 U.S. at 1049. "The behavior on which reasonable suspicion is grounded . . . need not establish that the suspect is probably guilty of a crime or eliminate innocent interpretations of the circumstances." *Carpenter*, 462 F.3d at 986. Thus, factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent. *Id.*; *see also Arvizu*, 534 U.S. at 277. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). And, in

this Circuit, the critical inquiry is not whether the searching officer actually feared danger, but whether "a hypothetical officer in the same circumstances could reasonably believe the suspect is dangerous." *United States v. Rowland*, 341 F.3d 774, 783 (8th Cir. 2003). "We review the district court's determination of reasonable suspicion *de novo* and its findings of historical fact for clear error." *United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010) (per curiam).

In this case, we conclude that at the time they commenced the protective search the deputies reasonably could suspect that Stewart was engaged in criminal activity and that he was armed and presently dangerous. The deputies were aware that Stewart had a prior felony conviction and some sort of history involving drugs and violent behavior. *See United States v. Winters*, 491 F.3d 918, 922 (8th Cir. 2007) (considering the totality of circumstances, including officer's knowledge that the suspect was a prior drug offender, in assessing reasonableness of officer's suspicion). The encounter occurred late at night in a neighborhood where, according to Deputy Stehlik, suspects had parked their vehicles after previous robberies at the nearby Kwik Shop. Indeed, Stewart had just departed the Kwik Shop parking lot, a location that had suffered "a rash of robberies" and was "a hot spot for a lot of criminal activity." *See United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) ("The encounter occurred in [a] neighborhood marked by frequent crimes involving firearms. This was a relevant fact to consider, especially in light of the attempted armed carjacking at an adjacent gas station a few days before."); *United States v. Abokhai*, 829 F.2d 666, 670 (8th Cir. 1987) (holding that officer's suspicion of two individuals leaving gas station was reasonably "heightened" due to armed robbery at a nearby gas station several days earlier). Moreover, Stewart's explanation of his presence at the store was not in harmony with Deputy Woodward's observations. Whereas Stewart stated that he had visited the Kwik Shop to help a friend who was having trouble with her car, Deputy Woodward did not observe Stewart exit his SUV or make contact with anyone. While the district court minimized the significance of these facts—stressing that Deputy Woodward briefly suspended his surveillance of the store—they "may be

considered . . . in the totality of circumstances" and lend some support to the conclusion that the deputies' suspicion was objectively reasonable. *Carpenter*, 462 F.3d at 987; *see also United States v. Roggeman*, 279 F.3d 573, 579 (8th Cir. 2002).

Further, in explaining his presence in the neighborhood, Stewart provided inconsistent statements regarding the marital status of the friend whose infidelities he was allegedly abetting. The district court also discounted this inconsistency, asserting that "references to a woman's 'boyfriend' and 'husband' are not necessarily inconsistent." *Stewart*, 675 F. Supp. 2d at 983. But while there may be a conceivable explanation for interchanging the terms "husband" and "boyfriend," such a discrepancy certainly may heighten a reasonable officer's suspicion. *See United States v. Gill*, 513 F.3d 836, 844-45 (8th Cir. 2008) (holding that vehicle occupants' inconsistent statements about their travel plans and "the number of children and grandchildren in their blended family," among other factors, contributed to reasonable suspicion that criminal activity was afoot); *United States v. Santos*, 403 F.3d 1120, 1131-32, 1133 (10th Cir. 2005) (holding that, while minor inconsistencies in suspect's answers—including referring to his "sister" as his "half-sister"—"do not weigh very heavily" in the determination of reasonable suspicion, "[c]onfusion about details is often an indication that a story is being fabricated on the spot" and "must be taken into consideration").

Stewart's deportment throughout the encounter also contributed to the deputies' suspicion that he was armed and presently dangerous. When Deputy Woodward asked him to produce a form of identification, Stewart repeatedly reached under his jacket, delved into the vehicle's center console, and reached underneath the seat before finally withdrawing his driver's license from a rear pocket. The district court dismissed this evidence, concluding that the "allegedly furtive gestures [were] explained by the fact that the defendant was searching for his identification." *Stewart*, 675 F. Supp. 2d at 982. However, when Deputy Stehlik arrived on the scene—*after* Stewart had located and provided his license—he also observed "the driver inside the

-8-

vehicle motioning towards the center console and then underneath the seat several times." *See Stachowiak*, 521 F.3d at 854 (holding that driver's act of reaching under seat of car as though "he were either concealing or retrieving something" contributed to reasonableness of officer's suspicion); *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006) (holding that officer's observation, during traffic stop, of passenger "ris[ing] off the seat and plac[ing] his hand behind his back as if he were placing something underneath or behind him" satisfied reasonable suspicion requirement). Further, the district court took no account of Deputy Woodward's testimony that, during the initial encounter, Stewart refused to maintain eye contact and was "[v]ery nervous[,] . . . very fidgety, [and] couldn't give . . . straight direct answers." *See Stachowiak*, 521 F.3d at 856 (holding that "nervous behavior" may contribute to reasonable suspicion); *United States v. Hanlon*, 401 F.3d 926, 929 (8th Cir. 2005) (holding that "extreme nervousness" and "failure to make eye contact," among other factors, contributed to officer's reasonable suspicion); *United States v. Galvan*, 953 F.2d 1098, 1103 (8th Cir. 1992) (noting, among other factors, that the suspect appeared nervous and refused to look at the agent during conversation).

The fact that Stewart accompanied Deputy Stehlik to one of the police cruisers while Deputy Woodward conducted the protective search of his vehicle does not alter this result. "[W]here an officer has temporarily removed a suspect from his vehicle, but is not planning to arrest him[,] the officer is permitted to conduct a limited protective search of the vehicle before releasing a suspect to ensure he will not be able to gain immediate control of a weapon." *Stachowiak*, 521 F.3d at 855. Neither does a court's capacity to conceive of innocent explanations for each suspicious circumstance, when considered in isolation, warrant according no weight to a trained officer's observations.[2] *Arvizu*, 534 U.S. at 274 ("*Terry* . . . precludes this sort of

---

[2] Although the district court noted in passing that "[t]he officers offered contradictory and equivocal testimony with respect to their reasons for suspicion," *Stewart*, 675 F. Supp. 2d at 982, it studiously avoided making any adverse credibility findings. Indeed, the court maintained that it "generally accept[ed] the factual

divide-and-conquer analysis.").  On the record before us, then, in view of the totality of the circumstances, we hold that at the moment the deputies initiated the Fourth Amendment encounter an officer reasonably could suspect that Stewart was presently engaged in criminal activity and that he was armed and dangerous.[3]

## III.  CONCLUSION

For the foregoing reasons, we reverse the district court's grant of Stewart's motion to suppress and remand for further proceedings not inconsistent with this opinion.

_____

findings of the magistrate judge," *id.* at 976, one of which was a determination that the deputies' testimony was credible.  Similarly, the district court did not develop its statement that the deputies contradicted each other's testimony, and our review of the record has uncovered no substantial inconsistencies.

[3] We make no comment on the propriety of the deputies' exploration of Stewart's pockets during the protective search.  As noted above, Deputy Woodward testified that Stewart verbally consented to the search of his pockets, whereas Stewart testified that he did not consent.  Presumably because the district court considered the protective search to be unconstitutional at its inception, the court did not make a factual finding regarding Stewart's consent to the search of his pockets. *See Florida v. Royer*, 460 U.S. 491, 507-08 (1983).  Likewise, we need not address the issue here, because the deputies' subsequent search of Stewart's vehicle bore no relation to the "fruits" of the search of his pockets.  Rather, the reasonable suspicion that supported the deputies' protective search of Stewart's person also supported their decision to conduct a protective search of the SUV before allowing him to reenter it.