# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-2875

_____

United States of America

*Plaintiff - Appellee*

v.

Jeremy Thomas Trogdon

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: April 17, 2015
Filed: June 18, 2015

_____

Before BYE and SMITH, Circuit Judges, and SCHILTZ,[1] District Judge.

_____

SCHILTZ, District Judge.

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, sitting by designation.

After the district court[2] denied his motion to suppress, Jeremy Trogdon entered a conditional guilty plea to possession of a firearm as a felon. Trogdon appeals, arguing that the police lacked reasonable, articulable suspicion to stop and frisk him. We affirm.

## I. BACKGROUND

In the early hours of August 8, 2013, Officers Natale Chiodo, Mike Fong, and Todd Wilshusen were patrolling in a marked squad car near the area around 22nd Street and University Avenue in Des Moines, Iowa. A week earlier, a shooting had occurred nearby, and in recent years the area had been the site of murders, other violent crimes, and narcotics and gang-related activity.

At about 1:00 a.m., the officers saw three men and two women loitering near a commercial building at 2121 University Avenue. The businesses in the building were closed. The owner of one of the businesses had previously filed a letter of trespass with the city. The letter informed the city that the owner had posted a no-trespassing sign on the property and requested police assistance. Specifically, the letter said:

> This letter is to advise you that I have posted my property located at 2121 University, Des Moines, with a sign prohibiting trespassing. Accordingly, if anyone is found on such premises during or after business hours, who is not actively engaged in or associated with productive activities or duties related to this property as requested or required by myself, it is without my permission.

[2]The Honorable James E. Gritzner, then Chief Judge, United States District Court for the Southern District of Iowa.

-2-

I hereby request the assistance of the Des Moines Police Department, in first advising and then, if necessary, arresting and charging those persons for trespassing on my property.

App. 19.

The officers continued patrolling for several more blocks before returning to the building, where they saw the same group of people continuing to loiter. The officers decided to approach the group, ask for identification, and advise them that they were trespassing. As the officers drove into the building's parking lot, Officer Chiodo recognized one of the men as Cornelius Brown.[3] Brown was a suspect in a murder investigation and several narcotics investigations. Brown was also the subject of a bulletin warning officers in the greater Des Moines area to use caution when approaching him because he is a gang member associated with violent crimes and is believed to be armed and dangerous.

Upon sighting the squad car, the group walked briskly across the lot and around the building toward 22nd Street. Vehicle access to 22nd Street from University Avenue is blocked by a berm located just north of the driveways to the parking lots on either side of the street. The group walked north up 22nd Street and around the berm. The officers observed one of the men, later identified as Trogdon, place something on the ground near the berm.

---

[3]Trogdon contends that Officer Chiodo did not recognize Brown until after he exited the squad car, but the testimony on which Trogdon relies simply states that, "as [Officer Chiodo] approached," he recognized Brown. App. 26. Later, Officer Chiodo clarified that he recognized Brown "as we were pulling in the lot," which was while he was still in the squad car. App. 27-28.

The officers followed the group in the squad car, driving over a curb onto the sidewalk and maneuvering around the berm. The officers then exited the squad car. Officer Chiodo approached Trogdon, ordered him to stop, and asked him if he had any identification. Trogdon responded that he did not. Officer Chiodo informed Trogdon that he was going to perform a pat-down search and grabbed Trogdon's arm to bring it behind Trogdon's back. Trogdon attempted to flee. With Officer Fong's assistance, Officer Chiodo took Trogdon to the ground and handcuffed him. Trogdon announced that he had a firearm, and the officers located a handgun in the waistband of his pants.

## II. ANALYSIS

On an appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. McMullin*, 576 F.3d 810, 814 (8th Cir. 2009).

The government does not dispute that Officer Chiodo's encounter with Trogdon was a *Terry* stop that implicated the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1 (1968). Likewise, the government does not dispute that Officer Chiodo's attempt to conduct a pat-down search of Trogdon — which ultimately resulted in Trogdon admitting that he had a gun — must pass muster under *Terry* and the Fourth Amendment.

Under the Fourth Amendment, officers may "conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about to commit a crime." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010). The officers must be able to identify "specific, articulable facts" that justify the stop. *Id.* Whether the officers had reasonable suspicion to conduct a stop is determined by the totality of the circumstances. *Id.*

After a suspect is lawfully stopped, an officer may in some circumstances conduct a pat-down search for weapons. *Id.* at 940-41. To justify the search, the officer must have reasonable, articulable suspicion that the suspect is armed and dangerous. *Id.* The officer need not know for certain that the suspect is armed; instead, a search is permitted "if a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* at 941 (quoting *Terry*, 392 U.S. at 27).

Applying these standards, we agree with the district court that the stop and frisk of Trogdon was lawful under the circumstances. These circumstances included the following:

Trogdon was loitering late at night in a commercial parking lot with a small group of people. The lot was located in a high-crime area where violence and gang and narcotics activity was commonplace. A week earlier, there had been a shooting on a nearby streetcorner. Officers may take these circumstances into account in determining whether there is reasonable suspicion. *See United States v. Stewart*, 631 F.3d 453, 457-58 (8th Cir. 2011) (defendant's presence late at night in a high-crime area supported reasonable suspicion); *United States v. Abokhai*, 829 F.2d 666, 670-71 (8th Cir. 1987) (recent robbery of nearby gas station supported reasonable suspicion).

One of the business owners had informed the city that he had posted a no-trespassing sign and requested police assistance in removing trespassers. Because it was late at night and the businesses were closed, there was no obviously legitimate reason for Trogdon and the others to be on the property. The officers therefore could reasonably suspect that Trogdon was trespassing. *See* Iowa Code § 716.7(2)(a)(2) (defining trespass to include entering or remaining on property without justification after being asked to leave by the owner). In addition, the officers knew from speaking with informants that drug dealing and other crimes took place in the parking lot after business hours. The officers therefore had at least some reason to suspect

that Trogdon might be committing or about to commit crimes in addition to trespassing.

Before getting out of the car, Officer Chiodo recognized one of the individuals as Cornelius Brown, a murder suspect who was the subject of a bulletin warning officers that he could be armed and dangerous. The officers were entitled to take Trogdon's association with Brown into account in determining whether Trogdon might also be armed. *Cf. United States v. Menard*, 95 F.3d 9, 11 (8th Cir. 1996) (officers could take into account that the defendant's companion was armed because, unlike in *Ybarra v. Illinois*, 444 U.S. 85 (1979), the men "did not just happen to be together in a public place").

After noticing the squad car, the group immediately began walking briskly around the building toward a blocked-off street where it would be difficult for a car to follow. Such evasive action can contribute to a finding of reasonable suspicion. *See Horton*, 611 F.3d at 939-40 (suspect briskly walking away after sighting officers supported reasonable suspicion).

Finally, the officers saw Trogdon place something on the ground near the berm, suggesting that Trogdon was trying to hide something from the officers. *See United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) ("Bailey's apparent attempt to conceal something provided Wells additional reason to suspect criminal activity."). Trogdon points out that neither the officers nor the district court relied on this circumstance to justify the stop. But "[t]he ultimate test . . . is not what the searching officer actually believed but what a hypothetical officer in exactly the same circumstances reasonably could have believed." *United States v. Roggeman*, 279 F.3d 573, 580 n.5 (8th Cir. 2002).

Taking into account all of these circumstances, the officers had a reasonable, articulable suspicion that criminal activity was afoot and that Trogdon was armed and

dangerous. The fact that, individually, some of the circumstances may also be consistent with innocent activity does not preclude a finding of reasonable suspicion. *Stewart*, 631 F.3d at 457 ("factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent"); *Bailey*, 417 F.3d at 878 ("a combination of innocent conduct can provide officers with reasonable suspicion of criminal activity").

Trogdon argues that several of the district court's factual findings are clearly erroneous. Specifically, Trogdon contends that the officers did not recognize Brown until after the *Terry* stop had commenced; that Trogdon did not walk "briskly" away from the officers; that Trogdon was not closely associated with Brown; and that the officers did not drive the squad car into the parking lot.

All of the district court's factual findings have evidentiary support. Officer Chiodo testified that he recognized Brown while still in the squad car, which was before Officer Chiodo ordered Trogdon to stop. Trogdon does not take issue with the district court's finding that Officer Chiodo ordered him to stop only after getting out of the squad car. Instead, Trogdon seems to suggest that the *Terry* stop began while the officers were still in the squad car. We disagree. The district court did not err in treating Officer Chiodo's order to stop as the point in time at which the *Terry* stop began and reasonable suspicion for the stop must be measured. *See United States v. Hightower*, 716 F.3d 1117, 1121 (8th Cir. 2013) (rejecting defendant's argument that stop occurred when the officers began approaching the group as "contrary to our precedent"); *Stewart*, 631 F.3d at 456 ("we must evaluate the constitutionality of the deputies' conduct as of the moment they began the protective search").

With respect to the group's walking pace, Officer Wilshusen described it as "brisk." Trogdon cites testimony that he was lagging behind the rest of the group, but

even if the district court was required to credit that testimony, Trogdon's position relative to the rest of the group is not inconsistent with a finding that Trogdon was walking briskly. Both the group and Trogdon could have been walking briskly, with a gap between the group and Trogdon being created when Trogdon paused to place something on the ground. In addition, the group was small, lingered together long enough for the patrolling officers to spot them twice, and left the parking lot together as a group. These circumstances support an inference that the group members were close associates and permitted the district court to take the entire group's behavior into account in determining whether there was reasonable suspicion. *See United States v. Dupree*, 202 F.3d 1046, 1049 (8th Cir. 2000) (where suspects appeared to be traveling in a group, the conduct of one suspect was relevant to reasonable suspicion of another suspect); *Menard*, 95 F.3d at 11 (officer could take into account that defendant's companion was armed because they "did not just happen to be together in a public place").

Finally, Officer Chiodo testified that the squad car pulled into the parking lot, causing the group to begin walking away. It is true that Officer Chiodo's testimony contradicts that of the other officers — in particular, the testimony of Officer Fong, who was driving the squad car and who testified that he did not drive into the parking lot. Even if Officer Fong's testimony casts doubt on the district court's contrary conclusion, however, it makes no difference to the district court's finding that the officers reasonably believed that the group was taking evasive action.

All of the officers testified that the group began walking away upon becoming aware of the officers' presence. Officer Wilshusen, in particular, testified that the group "immediately" began walking around the building and away from the officers after one member of the group spotted the squad car at the south intersection of 22nd Street and University Avenue. North of University Avenue, a berm turns 22nd Street into a dead end. But vehicles can still access the commercial parking lots on either side of 22nd Street because the entrances to those lots are south of the berm. As a

result, the section of 22nd Street that is north of University and south of the berm is essentially an extension of those parking lots, as there is nowhere else for a car to go.

Under the circumstances, and considering that it was late at night, an observer would likely conclude that the officers intended to engage the group that was loitering in the parking lot — whether the officers actually drove into the parking lot or instead drove into the dead-end street that was essentially an extension of the parking lot. There would be no other obvious reason for the officers to drive north across University and into the dead end on 22nd Street. A reasonable officer would therefore be justified in concluding that the group's immediate reaction upon seeing the officers — to walk briskly around the building and north toward the berm, where a car could not follow without driving off the road — constituted evasive action. Such an inference would be further justified by the sight of Trogdon placing something on the ground.

Trogdon also takes issue with the district court's holding that the suspected trespass helped to provide reasonable suspicion for a *Terry* stop. Trogdon argues that only one of the businesses on the property signed the no-trespass letter and that there is no evidence that a no-trespassing sign was actually posted on the property. As a result, Trogdon contends, he could not be guilty of criminal trespass. *See* Iowa Code § 716.7(2)(a)(2) (requiring notification to abstain, remove, or vacate from "the owner, lessee, or person in lawful possession, or the agent or employee of the owner, lessee, or person in lawful possession"). In addition, Trogdon argues that the officers were not justified in conducting a *Terry* stop to investigate a completed misdemeanor trespass because that offense presents no threat to public safety. *See United States v. Hughes*, 517 F.3d 1013, 1017-18 (8th Cir. 2008) (applying a balancing test to determine that officers were not justified in conducting a *Terry* stop to investigate a prior alleged trespass).

We disagree with a number of Trogdon's factual premises. To begin with, the no-trespass letter told the city that the business owner had posted a no-trespassing sign on the property, and that gave the officers a reasonable basis to conclude that such a sign had been posted. *See Bailey*, 417 F.3d at 877 ("a reasonable but mistaken belief may justify an investigative stop"). In addition, the no-trespass letter implies that the business owner has the authority to exercise control over the entire property; it identifies "my property located at 2121 University" and requests police assistance in thwarting "trespassing on my property." True, the signature block identifies the letter writer as the owner of the grocery store. But that does not necessarily mean that the writer is not *also* the owner of the property, as the letter implied.

Again, a reasonable belief, even if it is mistaken, can justify an investigative stop. We do not believe that the officers were required to conduct a title search to resolve the ambiguity in the letter — nor scour the premises to confirm that a no-trespassing sign had in fact been posted — before they could make a *Terry* stop. The standard is reasonable suspicion, not proof beyond a reasonable doubt, nor proof by a preponderance of the evidence, nor even probable cause. The letter gave the officers a reasonable basis to conclude that anyone loitering on the premises after business hours was trespassing.

Moreover, at the time that the suspects drew the attention of the officers, the suspected trespass was not "complete"; it was ongoing. The officers were investigating a possible trespass that was occurring before their eyes, not a possible trespass that was alleged to have occurred before officers arrived at the scene.

Finally, even if Trogdon were correct that the officers lacked reasonable suspicion that Trogdon was trespassing, the stop and frisk would still be lawful based on the totality of the circumstances. *See Hightower*, 716 F.3d at 1121 ("Even if a single factor identified by the district court, when viewed in isolation, did not support a finding of reasonable suspicion, our precedent prohibits such a fragmented

approach to reasonable suspicion."). The suspected trespass was only one of many factors, which included the time of night; the presence of Brown, a murder suspect who was believed to be armed and dangerous; reports that the parking lot was the site of drug dealing and other crimes after business hours; a nearby shooting that had taken place only a week before; and the group's reaction to the presence of the officers.

These factors distinguish this case from *Hughes*, in which the alleged trespass occurred during the day and was not witnessed by the officer. *Hughes*, 517 F.3d at 1015. The only factors supporting reasonable suspicion in *Hughes* were that (1) the alleged trespass took place in a high-crime area and (2) the defendant and another man fit the description given by an anonymous caller. *Id.* When the officer arrived on the scene, the men were standing near a public bus stop and did not engage in any suspicious conduct. *Id.* at 1016. In contrast to *Hughes*, here the alleged trespass took place late at night, the group included a known gang member believed to be armed and dangerous, and the group took evasive action after sighting the officers. We agree with the district court that, while each individual circumstance standing alone may not have been sufficient to create reasonable suspicion, the totality of the circumstances provided the officers with reasonable suspicion to stop and frisk Trogdon.

\* \* \*

For these reasons, we affirm the judgment of the district court.

_____

-11-