# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-3178

_____

United States of America

*Plaintiff - Appellee*

v.

Melvin M. Dortch

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 11, 2017
Filed: August 18, 2017

_____

Before RILEY, BEAM, and SHEPHERD, Circuit Judges.

_____

RILEY, Circuit Judge.

Melvin Dortch pled guilty to possessing a gun as a felon, see 18 U.S.C. § 922(g)(1), reserving the right to challenge the legality of the police pat-down that led to his arrest and prosecution. That challenge is now before us. See 28 U.S.C.

§ 1291 (appellate jurisdiction).  We hold the pat-down was constitutional, and the district court[1] was right not to suppress the evidence developed from it.

## I.    BACKGROUND

In the spring of 2015, members of the South Family gang moved into an Omaha apartment building claimed by the Hilltop Crips.  "[F]riction" resulted, drawing the attention of the Omaha Police Department's gang unit.  Officers in the unit received a report of shots fired in the area and were briefed about three instances of people being caught possessing guns illegally nearby, all four incidents occurring within the previous three weeks.  All three guns were recovered from vehicles after the police observed traffic violations in front of the apartment building.

On June 4, around 7:30 in the evening, two gang-unit police officers and a U.S. Marshal, on patrol in an unmarked vehicle, decided to drive past the building.  When they turned onto the block, the officers saw a car and a minivan stopped side by side.  Both vehicles were facing them, with the car on the officers' left, in its proper lane, and the minivan on their right.  As the officers approached, the car pulled in front of the minivan, putting both vehicles on the wrong side of the street.  The minivan was also parked too far from the curb.  Dortch was in the middle of the street, leaning into the minivan's passenger-side window.

The officers stopped and got out.  They did not turn on their siren or emergency lights.  Omaha police officer Mike Sundermeier walked toward Dortch while the others went to talk to the occupants of the car.  Officer Sundermeier was wearing a tactical vest with "Police" printed on the front.  He did not otherwise identify himself, issue any directions, or draw his weapon.  As Officer Sundermeier approached,

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska, adopting the findings and recommendation of the Honorable F.A. Gossett III, United States Magistrate Judge for the District of Nebraska.

Dortch looked at him over his shoulder, made eye contact, looked back into the minivan, put a cell phone on the passenger seat, and, in Officer Sundermeier's words, "pressed the front of his body up against the van." Dortch was wearing what Officer Sundermeier described as a "Carhartt-type coat," by which he meant a heavy canvas insulated winter coat.

When Officer Sundermeier was several yards away, he asked Dortch why he was standing in the road. Dortch turned his head slightly toward Officer Sundermeier and said "he was talking to his girlfriend." Dortch then turned back and continued his conversation. He remained leaning against the minivan.

Officer Sundermeier stopped a few feet from Dortch. By then, Officer Sundermeier later testified, he was worried Dortch might be armed. His concern was based on having encountered Dortch near the contested apartment building, the fact Dortch wore a "bulky" coat—the sort of clothing Officer Sundermeier had known people to hide things in—and kept his body pressed against the minivan, and Dortch having "freed his hands" by putting down the phone. Officer Sundermeier asked Dortch if he had a gun and Dortch said no, yet Officer Sundermeier told Dortch he was going to pat him down anyway. During the pat-down, Officer Sundermeier felt something heavy in Dortch's lapel pocket. Dortch then said "it's in my pocket." Officer Sundermeier handcuffed Dortch, looked in his coat, and found a pistol.

Dortch was arrested and eventually indicted on the felon-in-possession count. He moved to suppress the gun and statements he made under questioning. After an evidentiary hearing, the magistrate judge recommended denying the motion. The district court agreed. Dortch then entered his conditional guilty plea.

## II.    DISCUSSION

There is no dispute about the facts of what happened leading up to Officer Sundermeier finding the gun in Dortch's pocket. Whether those facts required

suppression of the resulting evidence is a legal determination we review de novo, "giv[ing] due weight to inferences drawn from th[e] facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996).

### A.    Walk Up

Dortch argues his interaction with Officer Sundermeier was a "seizure" implicating the Fourth Amendment from the start, even before the pat-down. "'[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" United States v. McKines, 933 F.2d 1412, 1415 (8th Cir. 1991) (en banc) (alteration in original) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)). In Dortch's view, any reasonable person in his place would have perceived an armed police officer walking up and asking what he was doing as effectively "a demand or an accusation," not an invitation to an optional conversation he could decline. That natural impression was borne out, according to Dortch, by the fact Officer Sundermeier did not leave him alone even though, in the few seconds between the initial contact and the pat-down, Dortch gave every possible indication he did not want to talk—he answered curtly, turned away, and kept talking to someone else.

We disagree with Dortch's characterization. To start, the suggestion that Dortch clearly, if implicitly, communicated he was done voluntarily interacting with Officer Sundermeier is in some tension with the fact that when Officer Sundermeier followed up with a second question—whether Dortch had a gun—Dortch again answered. Admittedly, a civilian confronted by a police officer might reasonably find it hard to refuse to answer that particular question, so we do not read too much into this detail. The more important point is that the law is clear "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

-4-

Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).  Dortch makes no claim that Officer Sundermeier used or threatened physical force when he first approached.  Nor does Dortch identify any show of authority by Officer Sundermeier beyond that inherent in his badge and (holstered) gun.  If that were enough to make an encounter with the police nonconsensual, the black-letter rule that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions," Florida v. Bostick, 501 U.S. 429, 434 (1991), would be a nullity.

Simply put, we have repeatedly found no Fourth Amendment seizure in circumstances where a reasonable person would have felt at least as much pressure to respond to police questioning as someone in Dortch's position.  See, e.g., United States v. Hayden, 759 F.3d 842, 845, 847 (8th Cir. 2014) (officers pulled up next to men walking on the sidewalk at night, shined a flashlight on them, loudly announced "police," and walked toward them); United States v. Stewart, 631 F.3d 453, 455-56 (8th Cir. 2011) (officer stopped behind a parked SUV, shined a spotlight on it, and asked the driver what he was doing in the area).  Dortch does not cite any contrary precedent or explain how his case is meaningfully different from the others.  We therefore find no pre-pat-down seizure here.

### B.   Pat-Down

The pat-down itself, however, was unquestionably a search and seizure for Fourth Amendment purposes.  See Terry, 392 U.S. at 19.  Such a "protective search," justified by a concern for the safety of the searching officer and others nearby, "is constitutional . . . 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person[] with whom he is dealing may be armed and presently dangerous.'"  United States v. Davis, 202 F.3d 1060, 1061 (8th Cir. 2000) (quoting Terry, 392 U.S. at 30); see also Terry, 392 U.S. at 32 (Harlan, J., concurring) ("Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own

protection, he must first have a right not to avoid him but to be in his presence."). Dortch argues the government fails to identify "specific and articulable facts" that, "taken together with rational inferences from those facts," Terry, 392 U.S. at 21 (majority opinion), made it reasonable to suspect either that crime was afoot or that Dortch was armed and dangerous.

First, as to what legal wrongdoing Officer Sundermeier reasonably could have suspected, it is enough that the minivan and car were unquestionably parked illegally. Dortch takes for granted that those infractions can have nothing to do with him, because he "was neither driving nor riding in a vehicle when the officers first saw him." He cites no support, however, and we see no reason for such a bright-line rule. This "reasonable-suspicion" analysis is to be conducted based on "the 'totality of the circumstances.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Although the scene the police came upon in front of the apartment building clearly gave them no reason to suspect Dortch of committing a traffic violation himself, the circumstances just as clearly indicated Dortch might be involved with the ongoing illegality the police observed. Not only was Dortch standing between the two illegally parked vehicles when the officers arrived, he was leaning into one and talking to the driver. Indeed, Dortch significantly continued doing so *during* his initial interaction with Officer Sundermeier. On these facts, we hold Officer Sundermeier could briefly stop Dortch to investigate what was happening with the vehicles and his involvement with it.[2] Cf.

_____

[2]Because Officer Sundermeier was entitled "to insist on an encounter" with Dortch, Terry, 392 U.S. at 32 (Harlan, J., concurring), on the basis of the traffic violations, we do not reach the government's assertion that Officer Sundermeier also could have stopped and questioned Dortch on the suspicion that Dortch might have reached where he was by illegally walking in the street, see Neb. Rev. Stat. § 60-6,156; Omaha, Neb., Mun. Code §§ 36-107, -112, or that he might have been illegally soliciting from the driver of the minivan, see Neb. Rev. Stat. § 60-6,157; Omaha, Neb., Mun. Code § 36-108. See also, e.g., United States v. Jones, 990 F.2d 405, 408 (8th Cir. 1993) ("Because we decide whether reasonable suspicion justifies a

Maryland v. Wilson, 519 U.S. 408, 414-15 (1997) (holding police officers making a traffic stop could order passengers out of the stopped car); United States v. Sanders, 510 F.3d 788, 790-91 (8th Cir. 2007) (extending Wilson to let a police officer order a passenger back into the stopped car).

The second question is "whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27 (majority opinion). The heart of Dortch's argument here is his assertion that this case is indistinguishable from United States v. Jones, 606 F.3d 964 (8th Cir. 2010) (per curiam). In Jones, we upheld the suppression of a gun Omaha police found when they stopped and frisked someone they thought looked suspicious. See id. at 965. To explain their suspicion, the police pointed to the facts that the defendant was walking "in a neighborhood considered to be a violent 'hot spot'" in a "high crime precinct," was "wearing a long-sleeved hooded sweatshirt" on a sunny 68-degree September afternoon, "'continually watched the officers [while they drove by on patrol] as if concerned that they would stop him,'" and was "'clutching the front area of his hoodie pocket with his right hand'" as he walked. Id. at 965-66. We held the stop was improper, and the resulting evidence inadmissible, because "'[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity.'" Id. at 967 (alteration in original) (quoting United States v. Gray, 213 F.3d 998, 1001 (8th Cir. 2000)).

The government insists Jones "has no application" here because it was about whether the police had reasonable suspicion to stop the defendant at all, not whether they could pat him down in the course of a legal interaction. The distinction makes no difference, however. The police in Jones stopped the defendant without suspecting anything other than he was carrying a concealed gun illegally, so the

detention based on all the objective facts, we are not limited by the detaining officer's subjective opinions.").

propriety of the stop turned on the exact same question as the propriety of the pat-down here: whether the police "lacked the requisite reasonable suspicion that [the defendant] was carrying a concealed firearm in his hoodie pocket, as opposed to some other object, or no object at all." Id.; see also id. at 966 ("Here, in contrast to the vast majority of cases in which protective frisks have been upheld, (i) the officers did not have reasonable suspicion that [the defendant] was engaged in criminal activity other than carrying a weapon . . . ; (ii) [the defendant] did not panic or flee when [an officer] approached; and (iii) [the defendant] was forcibly detained and searched before he said anything suspicious or incriminating."). That the issue arose at a slightly different stage in the analysis does not mean we can now simply ignore the holding in Jones.

Notwithstanding the broad similarities, we discern several factual differences between this case and Jones that together call for a different result. First, unlike in Jones, the location where Officer Sundermeier encountered Dortch was not just a neighborhood generally associated with violence and high crime rates. Cf. id. at 966. It was a specific building known to be the subject of an active territorial dispute between two gangs. The police knew shots had been fired (or at least reported fired) nearby recently. In the same time frame, there had been three gun arrests outside the building. In all three cases the guns were found in vehicles doing just what the officers observed when they arrived on the scene here—violating traffic laws on the block in front of the contested apartment building. Those circumstances provided a significantly stronger and more particularized basis for Officer Sundermeier to be concerned about the presence of a gun when he approached Dortch.

The details of the ensuing interaction, too, added to and reinforced Officer Sundermeier's suspicion. Start with Dortch's coat. In Omaha at least, a winter coat worn in June is significantly stranger—that is, significantly less likely to be "shared

by countless, wholly innocent persons," id. at 967—than a hoodie in September.[3] We think it was entirely reasonable for Officer Sundermeier to wonder why Dortch was wearing something so conspicuously inappropriate for the weather. Particularly given Officer Sundermeier's knowledge that he was at the location of an ongoing gang conflict and guns had recently been found in markedly similar situations, Officer Sundermeier could reasonably draw on his training and experience to suspect Dortch might be using the coat's bulk to hide a weapon. Additional support for that suspicion, also not present in Jones, came from the fact Dortch did not just happen to be wearing something that made it hard to see if he was armed. Dortch responded to the sight of an approaching police officer by actively moving in such a way—pressing the front of his body against the minivan—as to further conceal what, if anything, he had in his coat. Finally, we do not think it was unreasonable for Officer Sundermeier, already justifiably concerned Dortch could be armed, to attribute some potential significance to the fact Dortch's other response to seeing him approach was to put down his phone, thereby freeing his hands to reach for any weapon he might be carrying.

Our case law is clear that these circumstances can all properly bear on whether it was reasonable to suspect someone might be armed and dangerous. See, e.g., United States v. Bailey, 417 F.3d 873, 877 (8th Cir. 2005); United States v. Buchannon, 878 F.2d 1065, 1067 (8th Cir. 1989). To be sure, several of the factors Officer Sundermeier cited as contributing to his concerns—Dortch's empty hands, for example—hardly seem suspicious taken on their own. Yet Officer Sundermeier did not view each circumstance on its own, and neither must we. Again, our review on this issue looks to the totality of the circumstances, "allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions

---

[3]Officer Sundermeier testified Dortch's "Carhartt-type" coat was "not . . . similar to" a sweatshirt or hoodie. Asked to elaborate, Officer Sundermeier explained: "The Carhartt's made out of a heavy canvas material. It's insulated. It's got a hood and a zipper on the front."

about the cumulative information available to them." Arvizu, 534 U.S. at 273. There is no place in this analysis for a "'divide-and-conquer'" approach that would isolate each cited factor and disregard it if a court could "conceive of [an] innocent explanation[]." Stewart, 631 F.3d at 459 (quoting Arvizu, 534 U.S. at 274).

Nor is it overly surprising or problematic that the outcome of our totality-of-the-circumstances review is not the same in this case as in Jones. As the Supreme Court has explained, "because the mosaic which is analyzed for a reasonable-suspicion . . . inquiry is multi-faceted, 'one determination will seldom be a useful "precedent" for another.'" Ornelas, 517 U.S. at 698 (quoting Illinois v. Gates, 462 U.S. 213, 238 n.11 (1983)); see also Arvizu, 534 U.S. at 276 ("[A] totality of the circumstances approach may render appellate review less circumscribed by precedent than otherwise."). In the context of a "commonsense, nontechnical" standard like "reasonable suspicion," which must be evaluated in light of the whole mass of facts and circumstances present in a given situation, Ornelas, 517 U.S. at 695, it is natural for cases that resemble each other in certain ways or at a high level of generality to come out differently as a result of key details that weigh differently in one than in the other. Cf., e.g., McKines, 933 F.2d at 1417-19 (overruling a line of decisions that had suggested a bright-line test for determining when a drug-interdiction officer's interaction with a traveler at an airport rose to the level of a Fourth Amendment seizure, because "'[e]ven in the discrete category of airport encounters, there will be endless variations in the facts and circumstances'" and "[r]eference to factors relied on in some other case may be useful, but not determinative" (quoting Florida v. Royer, 460 U.S. 491, 506 (1983))).

So it is with this case and Jones. To recapitulate, the short stretch of street where Officer Sundermeier encountered Dortch had a more specific and direct connection to guns (with recent reports of gunshots) than the neighborhood-wide "'hot spot'" at issue in Jones; Dortch's heavy coat was markedly more unseasonable in June, and thus unusual and suspicious, than the Jones defendant's sweatshirt in

-10-

September; Dortch's apparent association with the two illegally stopped vehicles, which resembled those in which guns had been found in the same location not long before, had no analogue in <u>Jones</u>; and Dortch's movements, suggestive of concealment and preparation for action, were more threatening than the protective "clutching" the police observed in <u>Jones</u>. <u>Jones</u>, 606 F.3d at 966-67. To hold that a police officer's concern for safety was reasonable in the one case but not the other is not to make the law "unknowable" or "unworkable," as Dortch warns. Rather, "it is the nature of the totality[-of-the-circumstances] rule." <u>Arvizu</u>, 534 U.S. at 276.

## III.  CONCLUSION

Officer Sundermeier did not search or seize Dortch in a constitutional sense until the pat-down, which was justified by reasonable suspicion. There was no need to suppress the resulting evidence. Dortch's conviction is affirmed.

_____